E. MARTIN ESTRADA
United States Attorney
SCOTT M. GARRINGER
Assistant United States Attorney
Chief, Criminal Division
SCOTT M. LARA (Cal. Bar No. 296944)
CATHARINE A. RICHMOND (Cal. Bar No. 301184)
Assistant United States Attorneys
Violent and Organized Crime
     312 North Spring Street, 12th Floor
     Los Angeles, California 90012
     Telephone: (213) 894-0427/7162
     Facsimile: (213) 894-0141
     Email:   scott.lara@usdoj.gov
              catharine.richmond@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

                  UNITED STATES DISTRICT COURT

              FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>          Plaintiff,<br><br>               v.<br><br>STEVE JACKSON RODRIGUEZ,<br><br>          Defendant. | No. ED CR 21-0188(B)-JWH-1<br><br>GOVERNMENT'S SENTENCING POSITION FOR DEFENDANT STEVE JACKSON RODRIGUEZ<br><br>[Exhibits Filed Concurrently Under Seal]<br><br>**SENTENCING DATE:**<br>January 13, 2023, at 2 P.M. |

     Plaintiff United States of America, by and through its counsel

of record, the United States Attorney for the Central District of

California and Assistant United States Attorneys Scott M. Lara and

Catharine A. Richmond, hereby files its Sentencing Position for

Defendant STEVE JACKSON RODRIGUEZ.

///

///

1        This argument is based upon the attached memorandum of points

2   and authorities, the files and records in this case, the exhibits

3   filed concurrently under seal with this sentencing position, and such

4   further evidence and argument as the Court may permit.

5   Dated: December 30, 2022        Respectfully submitted,

6                                   E. MARTIN ESTRADA
                                    United States Attorney
7
                                    SCOTT M. GARRINGER
8                                   Assistant United States Attorney
                                    Chief, Criminal Division
9

10                                      /s/ Scott M. Lara
                                    _____
11                                  SCOTT M. LARA
                                    CATHARINE A. RICHMOND
12                                  Assistant United States Attorneys

13                                  Attorneys for Plaintiff
                                    UNITED STATES OF AMERICA

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**TABLE OF CONTENTS**

<u>DESCRIPTION</u>                                                                <u>PAGE</u>

**Contents**

TABLE OF AUTHORITIES...........................................iii

MEMORANDUM OF POINTS AND AUTHORITIES.............................1

I.    INTRODUCTION...............................................1

II.   FACTS......................................................2

    A.    Defendant Maneuvered Himself into a Position of Trust
        As The Sole Nighttime Caregiver at a Group Home to
        Repeatedly Film Himself Raping Numerous Disabled
        Children...................................................2

        1.    Defendant's Production of Child Pornography of
            Him Raping Minor Victim 1............................4

        2.    Defendant's Production of Child Pornography of
            Him Raping Minor Victim 2...........................11

        3.    Defendant's Production of Child Pornography of
            Him Raping Minor Victim 4...........................12

        4.    Defendant's January 2018 Conduct....................14

        5.    Defendant's Admissions at Arrest....................15

    B.    Defendant Produced Child Pornography of Himself Having
        Sex With a Teenage Girl He Enticed to Engage in
        Criminal Sexual Conduct With Him.........................16

    C.    Defendant's Additional Sexual Misconduct.................16

        1.    Sexual Assault of an Unconscious Adult..............17

        2.    Contemporaneous Offers to Abuse Children...........18

        3.    Contemporaneous Attempts to Regain Access to the
            Care Home Victims...................................19

        4.    Contemporaneous Attempts to Find Other Night Jobs
            Watching Other Disabled Children....................20

        5.    Contemporaneous Searches for Child Sex Dolls.......20

        6.    Contemporaneous Attempts to Trick His Minor Live-
            in Niece to Have Sex with Him.......................20

        7.    Possession of Other Child Pornography...............21

**<u>TABLE OF CONTENTS (CONTINUED)</u>**

<u>DESCRIPTION</u>                                                                                      <u>PAGE</u>

     D.   Defendant is Charged and Pleads Guilty...................21

     E.   GUIDELINES CALCULATIONS..................................21

          1.   Multi-Count Adjustment............................22

          2.   Pattern of Prohibited Sexual Conduct..............22

          3.   Guidelines Sentence of Lifetime Imprisonment.......22

III. REQUESTED SENTENCE...........................................23

     A.   The Sentencing Factors at 18 U.S.C. § 3553(a) Support
         a Guidelines Sentence of Lifetime Imprisonment..........24

          1.   The Nature and Circumstances of the Offense........24

          2.   Need to Afford Adequate Deterrence and Protect
              the Public from Further Crimes of Defendant........26

          3.   Need to Reflect the Seriousness of the Offense
              and Provide Just Punishment.......................29

          4.   Avoiding Unwarranted Sentencing Disparities........29

          5.   History and Characteristics of the Defendant.......30

     B.   Supervised Release....................................31

     C.   Restitution...........................................31

     D.   Fine..................................................31

     E.   Forfeiture............................................32

IV.  CONCLUSION...............................................32

**TABLE OF AUTHORITIES**

<u>DESCRIPTION</u>                                                                                     <u>PAGE</u>

**Cases**

<u>United States v. Saeteurn</u>,
  504 F.3d 1175 (9th Cir. 2007) .................................... 28

**Statutes**

18 U.S.C. § 2253.................................................. 31
18 U.S.C. § 2259A........................................ 21, 30, 31
18 U.S.C. § 3014(a)(3)................................... 21, 30, 31
18 U.S.C. § 3553(a)................................ ii, 4, 23, 28
18 U.S.C. § 3553(b).............................................. 29

**Rules**

U.S.S.G. § 4B1.5................................................. 22

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.  INTRODUCTION

3
   Defendant STEVE JACKSON RODRIGUEZ ("defendant") should spend the
4
remainder of his life in prison for recording himself mercilessly
5
raping severely disabled children entrusted to his care while he
6
worked alone as their caregiver in a group home.  He thereafter
7
distributed some of those files and also offered for other people to
8
rape the children too.

9
   Defendant's youngest known victim was just 6 years-old when he
10
began abusing her.  When she was 8 years-old, he filmed himself
11
thrusting his penis into her small anus and forcing his penis deep
12
into her mouth towards her throat.  The child could not talk due to
13
her severe disabilities, but her pain and protest were evidenced by
14
her distressed grunting and moaning.

15
   He also raped her wheelchair-bound housemates with one being
16
blind, deaf, and mute and the other having cerebral palsy.

17
   Defendant gained access to his victims by "volunteering" for
18
undesirable overnight shifts at the group care home to ensure he was
19
alone with unfettered access to non-verbal disabled children who had
20
neither the bodily ability to resist nor the verbal ability to report
21
his repeated rapes.  Defendant knew most of these children had been
22
previously abused or neglected by their parents and therefore placed
23
in the group care home.

24
   Defendant also enticed a 15-year-old victim to have sex with him
25
when he was in his mid-30s and produced child pornography of her.

26
   For this conduct, the government and Probation Office both
27
recommend a guidelines sentence of life imprisonment.

28

1    **II.   FACTS**

2         **A.   Defendant Maneuvered Himself into a Position of Trust As
3              The Sole Nighttime Caregiver at a Group Home to Repeatedly
              Film Himself Raping Numerous Disabled Children**

4         From 2014 to 2016, in March 2017, and from December 2017 to

5    January 2018 defendant was a Certified Nursing Assistant ("Nursing

6    Assistant") at the group home funded in part by County money in Chino

7    Hills, California ("Care Home") for severely mentally and physically

8    disabled children.  (Dkt. 155, Amended Plea Agreement ("Plea

9    Agreement") at 15.)  The children had been placed at the Care Home

10   due to abuse, neglect, or the inability of the parents to care for

11   their children.  Defendant knew this.  (<u>See</u> Exhibit ("Exh.")[1] D at

12   40:14-40:25.)

13        Defendant also knew just how disabled the children in the Care

14   Home, and in his care, were because his work was needed precisely

15   because the children's disabilities precluded them for caring for

16   their own most basic needs.  For example, some of the children needed

17   wheelchairs, colostomy bags, or feeding tubes.  Many were non-verbal

18   and had limited cognitive capacity.  They needed 24-hour care and

19   supervision.  (Dkt. 112, Presentence Report ("PSR") ¶ 15(a), (c),

20   (d).)

21

22   _____

23        [1] All the exhibits in this case are being filed
     contemporaneously under seal due to their sensitive nature (as
24   described in the government's accompanying declaration to the <u>ex
     parte</u> application for an under-seal filing).  The child and age-
25   undetermined pornography exhibits – in addition to being filed under
     seal – are also being filed <u>in camera</u> because they are contraband (or
26   possible contraband in the case of the age-undetermined pornography).
     Whenever the Court is ready to view these exhibits, it can contact
27   the government's counsel of record who will arrange for the case
     agent to bring these exhibits (and a secured viewing device) to the
28   Court.  Typically, the Court will ask to view these exhibits either
     on a day before sentencing or on the day of sentencing before the
     hearing begins.

The Care Home was small, caring for about six children at that time, and as such, defendant had intimate knowledge of each child's severe limitations.  In addition, as a Nursing Assistant, defendant had access to the children's medical files which listed their unambiguous medical diagnoses which included conditions like cerebral palsy, mental retardation, and severe hip dysplasia.

Defendant's job was to be an overnight caregiver for disabled people that lived at the Care Home.  (PSR ¶ 14.)  These people included Minor Victim 1 (Exh. A), Minor Victim 2 (Exh. B), and Minor Victim 4 (Exh. C),[2] (collectively the "Care Home Victims").  (PSR ¶ 15.)

Defendant requested to work the overnight shift, also called the nocturnal shift (or "noc").  (PSR ¶ 16.)  Defendant knew that he would be scheduled to work the noc shifts alone, as opposed to the daytime shifts which tended to have additional employees present. (PSR ¶ 16.)

Defendant therefore carefully selected his time, location, and victim pool to give himself access to the most vulnerable children. Defendant knew he would have sole access to prepubescent and pubescent children away from all other adults, alone for most of night.  Defendant knew his victims had such severe disabilities they could not even attempt to physically resist him or meaningfully report his abuse.

At the time, defendant was a grown, fully able-bodied, educated man in his early-to-mid thirties.  This made defendant among the

---

[2] The government refers to the victims as Minor Victims 1, 2, 3, and 4 to preserve their privacy.  The government provided documents to the Court and defense counsel that identifies the Minor Victims with their true legal names.

strongest and the victims among the weakest people.  Defendant abused
this power to molest his victims with almost no risk of being caught
or stopped.

And that is exactly what happened for years.

But raping them alone was not enough for defendant.  Defendant
filmed his abuse and thereby created child pornography.  These
produced files provide insight into defendant's mind.  In many of
them, he calls out the victims' names, pans to their faces to capture
their reactions (showing pain, humiliation, and degradation), and
excitedly and breathily narrating his sex acts ("Fucking her ass
right now").

> 1. <u>Defendant's Production of Child Pornography of Him
>    Raping Minor Victim 1</u>

Defendant began abusing Minor Victim 1 when she was
approximately 6 years-old and continued to abuse and rape her until
she was approximately 8 years-old.  (PSR ¶ 15.)

According to her attorney, Minor Victim 1 has been diagnosed
with autism with language and intellectual impairment, seizure
disorder, impose control disorder, disruptive dysregulation disorder,
posttraumatic stress disorder, bipolar disorder – type 2, and
requires the use of a colostomy bag.  (Exh. E).  Minor Victim 1
communicates at the level of a much younger child; Defendant himself
described Minor Victim 1 as only being able to speak "little words"
like a 3 year-old.  (Exhs. E and D at 40:03-40:15.)  She is currently
13 years-old.

Defendant was aware of Minor Victim 1's disabilities when he
began raping her because he saw her on a weekly basis and had access
to her medical file for work.  (PSR ¶ 15(b).)

4

1

           *a.   Defendant's Rapes of Minor Victim 1*

2      Defendant's first documented child abuse of Minor Victim 1 was a

3  photograph of Minor Victim 1 sitting on a urination pad, with

4  defendant's penis about two inches from her vagina.  (PSR ¶ 22.)

5  This image was charged in Count 1 in the Indictment.  She was then

6  about 6 years-old.  (PSR ¶ 15.)

7      On at least four occasions, defendant also filmed himself

8  putting his penis into Minor Victim 1's mouth.  The government played

9  two of these videos during co-defendants' trial as Government's

10  Exhibits 23 and 24.[3]  In this section, the government discusses

11  Exhibits 23 and 24, a video charged in the Indictment in Count 6 but

12  not shown at co-defendants' trial, and an additional video discovered

13  in defendant's Google account which was not charged.

14      In one video (charged in Count 6 of the Indictment), Minor

15  Victim 1 is on her knees on the floor.  Defendant's hand is placed on

16  the back of her head to maximize his ability to put his penis in her

17  mouth.  The viewer can hear Minor Victim 1 struggle in response.  She

18  gags in discomfort.  With his penis in her mouth, he instructs her to

19  "suck that shit."  Defendant's penis comes out of her mouth but

20  remains in the vicinity of her mouth.  He then says, "suck on that

21  shit."  Because Minor Victim 1 was a small child at the time, her

22  mouth was not fully developed.  Defendant, however, had an adult

23

24

-------------------------------------------------------------------

25     [3] The government played only those videos that defendant
    distributed to co-defendants at co-defendants' trial, that is

26    Government's Trial Exhibits 23 and 24.  Because the Court has already
    seen these videos during co-defendants' trial, the government is not

27    attaching them hereto as exhibits.  If the Court would like to view
    these videos again, however, the government will provide them to the

28    Court when the Court views the under seal and in camera child
    pornography exhibits attached hereto (described further below).

1   sized penis, and when he forced his adult penis into her small mouth,

2   his penis filled the entirety of her mouth cavity.

3       In another video (Exhibit 23 shown at trial), defendant thrusts

4   his penis deep into Minor Victim 1's mouth toward her throat causing

5   her to gag.  Defendant's penis comes out of her mouth.  Moments

6   later, she cries out and shouts, "no, baby!"

7       In another video (Exhibit 24 shown at trial), victim remains

8   essentially motionless as defendant holds her head in position as he

9   moves his penis continuously around in her mouth.

10      In another video (the uncharged video found in defendant's

11  Google account), defendant attempts to force Minor Victim 1's mouth

12  open with the head of his penis.  Minor Victim 1 begins to cry out

13  and defendant "shushes" her as the camera pans away.  The camera pans

14  back to Minor Victim 1's face and the viewer sees that defendant has

15  succeeded in forcing his penis into her mouth.  He then removes his

16  penis and begins tapping his penis on her mouth and cheek.

17      Defendant also filmed himself with his head pushed between Minor

18  Victim 1's legs as she laid on a bed with his mouth on her vagina.

19  This video is charged as Count 9 in the Indictment.  At the beginning

20  of the video, defendant pans up to capture Minor Victim 1's face.

21  Defendant used his tongue to lick the folds of her genitals and force

22  his tongue in between her pubis mons into her labia majora and

23  minora.  Demonstrating his sheer lack of sympathy, defendant gives

24  the camera the "okay" sign while molesting the girl.  At the end of

25  the video, defendant zooms in on her vagina and attempts to spread

26  open her pubis mons to expose her labia.  Minor Victim 1 can be heard

27  vocalizing in response.  The Court viewed stills from this video

28  during co-defendants' trial as Government's Exhibits 13, 14, and 15

and the government will provide those to the Court again, if requested.  If the Court would like to see the full video, the government will provide it to Court.

Defendant also filmed himself attempting to put his erect penis into Minor Victim 1's anus while she laid on her back on a bed.  This video was charged in Count 9 in the Indictment.  Minor Victim 1 was about 8 years-old at the time and therefore her anus was much smaller than an adult's anus.  Defendant placed his penis's head into the opening of her anus.  Victim vocalized in response.  The Court also viewed this video during co-defendants' trial as Government's Exhibit 27 and the government will provide it to the Court again, if requested.

Defendant also filmed another video depicting his attempt to thrust his erect penis into Minor Victim 1's anus.[4]  This video was also charged in Count 9 in the Indictment.  The video begins with him placing his penis's head on the outside of her anus.  Defendant begins to attempt to penetrate her anus by pushing his penis's head against the opening of her anus.  Defendant, however, has great difficulty due to the aforementioned size difference.  He pushed so hard his penis compressed like an accordion.  While attempting to fully force his penis into her anus, defendant pans up to Minor Victim 1's face to capture her reaction.  Unlike in adult pornography where the recipient often displays pleasure, Minor Victim 1 instead

---

[4] Defendant agreed in his plea agreement that he touched his penis to Minor Victim 1's anus.  This is true.  Touching includes penetration.  Penetration, in turn, includes entry of a penile organ into an orifice, no matter how slight the entry.  Thus, the government agrees with defendant that he touched his penis to Minor Victim 1's anus, but the government characterizes that touching as penetration.

displays passivity.  Defendant then pans back down to his attempts to force his whole engorged penis into her small anus.  The Court viewed this video during co-defendants' trial as Government's Exhibit 25 and the government will provide it to the Court again, if requested.

In his plea agreement, defendant admitted what is apparent from the videos charged in Count 9 themselves: that they displayed sadistic conduct.  (Plea Agreement at 26, Count 9.)

Defendant also filmed a video of him preparing to abuse Minor Victim 1 in her bedroom.  Minor Victim 1 is standing by her bed. Defendant calls her name and grabs her by the arm to pull her closer. She makes a noise and he "shushes" her.  Minor Victim 1 is dressed in a leotard which defendant beings to pull off her small frame.  While he undresses her, she asks, "wee wee?"  He tells her to turn around. He begins to remove the leotard and as her buttocks are revealed, he breathily whispers his excitement, "look at that, look at that, fuuuck."  Minor Victim 1 covers her exposed buttocks with her hands. Defendant breathes heavily, "Oooo fuck."  Defendant then slaps Minor Victim's 1 buttocks twice causing them to shake in response.  She tightly clenches her buttocks and vocalizes her discomfort in response.  Defendant brags, "I'm gonna fuck her right now" while he continues to grope her buttocks.  As he slaps and grabs her buttocks he says, "hear that?  I'm gonna fuck this ass right now.  Right baby? Right?"  Minor Victim 1 emits a high-pitched squeal in response. Defendant says, "[MINOR VICTIM 1'S FIRST NAME], look."  The Court has not seen this video, but the government will provide it to the Court, if requested.

1    Defendant admitted that he sexually assaulted Minor Victim 1

2  while Minor Victim 2 was in the same room.  (See Exh. D at 26:26-

3  27:17.)

4    Defendant produced at least 10-20 videos of his sexual assault

5  of Minor Victim 1.  He sent some of those files to co-defendants.

6  (PSR ¶ 19.)  Some files of child pornography depicting Minor Victim 1

7  were found in defendant's LG G6 phone in a folder titled with a

8  misspelling of Minor Victim 1's name.  (Declaration of Paul J.

9  Radlinski ("Radlinski Decl.") ¶ 9.)

10    According to Minor Victim 1's current caregiver and her

11 attorney, she has started exhibiting frequent hypersexual behavioral

12 outbursts, which they attribute to defendant's conduct.  (Exh. E;

13 Exh. F.)  Specifically,

14        ... this includes but is not limited to: constant
          masturbation until her skin is raw or bleeds, in both
15        public areas and in private; undressing in public; touching
          and pinching her breasts; humping the floor; and making
16        verbal or physical sexual advances towards group home staff
          and peers.  She is reported to have become more physical
17        with herself and in addition would attempt to gain male
          attention in her group home.  [MINOR VICTIM 1's FIRST NAME]
18        also exhibits physical aggression towards others and
          towards herself.  [MINOR VICTIM 1's FIRST NAME] also
19        experiences sleep disturbances.  She does not like to sleep
          alone and prefers to sleep on a couch surrounded by group
20        home staff.

21        [MINOR VICTIM 1]'s behaviors have become so extreme that
          she now requires placement where there is one to one
22        staffing, with noted recommendations for placement in a
          locked facility.
23
          Exh. E.
24
                    b.   Defendant's Distribution of Child Pornography
25                       Depicting Minor Victim 1

26
     Defendant admitted that he distributed child pornography to
27
   others on the internet, sometimes in a quid pro quo exchange for
28

1   others child pornography.  (Exh. D at 34:40-34:59 & 35:30-35:53).

2   Defendant also distributed child pornography of Minor Victim 1 to co-

3   defendants.  (See Exh. G;[5] Exh. H.)  He was distributing child

4   pornography of Minor Victim 1 up until the day before he was

5   arrested.  (PSR ¶ 21; Exh. G at 15-17; Exh. H at 11.)

> *c.  Defendant's Creation of GIFS of Child Pornography Depicting Minor Victim 1*

8   Law enforcement found an extensive array of different clips made

9   from videos of defendant sexually assaulting Minor Victim 1.  Law

10  enforcement found these clips in defendant's Google Account.

11  For example, defendant made a still image GIF[6] depicting Minor

12  Victim 1's legs spread with her face, vagina, and colostomy bag

13  visible, in which defendant added the caption, "This forever will be

14  my PUSSY!!!  I don't care what anybody thinks this belongs to me and

15  only me!  I will KILL for this PUSSY!!!  Anybody trying to take it

16  away from me I will kill you!!!"  (PSR ¶ 29(a), fn. 1.)

17  Defendant made a short video GIF of defendant forcing Minor

18  Victim 1 to orally copulate defendant's penis wherein he added a

19  song, a waving American flag, and a caption which read "sucking my

20  cock!!  Hahaha soo illegal and soo wrong and very disturbing!!!"

21  (PSR ¶ 29(a), fn. 1.)  Defendant also made a still image GIF that

22  depicted Minor Victim 1 being forced to orally copulate defendant's

23  penis with the added caption "...Soo illegal and soo wrong and very

24  disturbing!!!" (PSR ¶ 29(a), fn. 1.)  He made another still image

---

[5] Exhibit G is redacted and does not contain the child pornography, which remains in the agent's possession.

[6] Static or animated file often played on a loop with accompanying words.  (PSR ¶ 29.a, fn. 1.)  A user can add backgrounds, music, or words to the video or static image.

depicting Minor Victim 1 holding the base of an adult male's penis with the added caption "The face you make when you know your pictures are guna end up on the deep web." (Radlinski Decl. ¶ 4.)

                  2.   Defendant's Production of Child Pornography of Him Raping Minor Victim 2

Minor Victim 2 was approximately 12 years old when defendant created the first documented child pornography of her at the Care Home. Minor Victim 2 became the responsibility of the government after she was physically and sexual abused when she was 3 years-old. (PSR ¶ 89.) Minor Victim 2 has been diagnosed with shaken baby syndrome, traumatic brain injury, cerebral palsy, and severe hip dysplasia. (PSR ¶ 89.) She requires the use of a feeding tube, wheelchair, and diapers. (PSR ¶ 89.) Defendant knew her medical conditions and age as he saw her on a regular basis and had access to her medical file. (Id. ¶ 15(c).)

                  *a.  Defendant's Rapes of Minor Victim 2*

Defendant produced child pornography of Minor Victim 2 in a file titled "20180101_014805.mp4" (the "805 video"). (Plea Agreement at 21). This video was charged as Count 7 in the Indictment. The government is attaching this video as an exhibit, Exhibit S, hereto under seal and in camera. (Exhibit S.)[7]

In this video, Minor Victim 2 is laying on her side on a bed. Defendant appears defendant is penetrating Minor Victim 2 with his penis, but it is unclear whether he is penetrating her anus or vagina given the way the video was filmed. Defendant removes his penis and

---

[7] The government is providing two child pornography videos in camera for the Court's review. The Court has not seen these videos. All the child pornography referenced, however, is available for the Court or defense counsel to review.

places a blue condom on it.  Defendant pulls apart Minor Victim 2's

buttocks and focuses on her anus.  Defendant puts the phone down, and

the viewer can hear only audio.  Minor Victim 2 is vocalizing her

discomfort and defendant instructs her, "relax, relax, relax."  He

asks, "you like it?"  Minor Victim 2 does not respond.  He instructs

her, "turn around, I'm going to fuck you more."  Minor Victim 2

groans "ow" and then groans again.  The viewer can hear rhythmic

pounding and squeaking sounds consistent with penetrative sex.

Defendant picks the camera back up and films Minor Victim 2's face.

Defendant pans down to where he is penetrating her with his penis.

He takes his penis out of her and again puts the camera down.  He

asks, "okay?" and then seems to ask something about Minor Victim 2's

"pussy now?" to which Minor Victim 2 responds something to the effect

of "I don't like."[8]  Defendant asks, "huh?" to which Minor Victim 2

repeats (what sounds like), "I don't like."  He then instructs her to

turn around again.

### 3. Defendant's Production of Child Pornography of Him Raping Minor Victim 4

Minor Victim 4 has severe mental disabilities, including severe

mental retardation and cerebral palsy, is non-verbal and is deaf and

blind.  (PSR ¶ 15(d).)  She is confined to a wheelchair and typically

wears a diaper.  (PSR ¶ 15(d).)  Despite being in a wheelchair, can

be brought out of her wheelchair and physically manipulated without

---

[8] Due to Minor Victim 2's disabilities, it is difficult to understand her speech.  The agent working on this matter and government counsel reviewed this video multiple times, however, and agree as to the substance of what they believe Minor Victim 2 is attempting to communicate.  Because the Court will view this video for itself, however, the government defers to the Court's factual findings as to what Minor Victim 2 communicates.

being seriously injured.  Minor Victim 4 was 17 years old in March 2017, when defendant created videos of sexual abuse depicting her.  (PSR ¶ 15(d).)  Defendant admitted that he knew she was a minor when he raped her in March 2017 because he reviewed her medical files for his job.  (Plea Agreement at 18.)

   a.   *Defendant's Rapes of Minor Victim 4*

Defendant created two videos of child pornography which appeared to depict one continual rape of Minor Victim 4 in March 2017.  These videos were charged in Count 4 of the Indictment.  One of these videos is titled 20170315_014555.mp4 (the "555 Video"), which the government is attaching under seal and <u>in camera</u> hereto as an exhibit, Exhibit T.  (Exh. T.)

In the 555 video, Minor Victim 4 is in a bathroom, bent over with her face resting on the tile floor.  What appears to be her diaper is around her knees.  Defendant anally penetrates Minor Victim 4 with his penis.  He brags, "I'm fucking [MINOR VICTIM 4'S FIRST NAME] right now, fucking her in the ass."  Then he groans, "oh yeah."  He again says, "I'm fucking her ass right there."  Then he slaps her buttocks three times while his penis is still inserted in her anus.  He breathes heavily and groans, "oooo fuck."  He says, "I'm gonna cum, I'm gonna cum fucking [inaudible]."  (Exh. T.)  A second video which is not attached to this filing appears to be a continuation of defendant anally raping Minor Victim 4.

Defendant also created two pornography files depicting Minor Victim 4 on January 1, 2018.  Minor Victim 4 was 18 years old at the time.  Therefore, these videos do not meet the statutory definition of child pornography and the government is not presenting them to the Court as child pornography.  Regardless, defendant's continued sexual

13

abuse of a blind, deaf, and mentally disabled person in his care –
which began when the person was a child – is an aggravating factor.

The government is not attaching these videos hereto as exhibits.
If the Court wishes to view these videos, however, the government
will provide them.

In the first video, Minor Victim 4 (who was then an adult) is on
what appears to be a bed.  What appears to be her diaper is pulled
down revealing her buttocks.  Defendant is penetrating her anus with
his penis and slapping her buttocks.  He says, "that ass."  It sounds
like he also says, "look at that ass crack."  He breathes heavily and
as he removes his penis he says, "damn . . . fuck, oh fuck."  He
breathes heavily again.

In the second video, Minor Victim 4's diaper is down and her
buttocks are exposed.  Defendant zooms in on her anus where there is
a red substance that is consistent with the appearance of blood.
Defendant pans out to reveal his penis, which is covered in a blue
condom.  It appears he uses the head of his penis to penetrate her
anus, but given the way the video is filmed it is not entirely clear
if the attempted penetration is successful.  He removes his penis and
then zooms in again on her anus and ends the video.

### 4.   Defendant's January 2018 Conduct

Approximately nine months after leaving the Care Home for a new
job, defendant asked the managers for overnight shifts at the Care
Home.  Defendant was able to secure shifts watching the Minor Victims
in the Care Home in the early morning hours of January 1, and January
27, 2018.  (PSR ¶¶ 27-28.)  Defendant admitted that one of his
primary and predominate purposes in regaining this employment was to
gain custody/control over the minors of the Care Home to create child

pornography depicting Minor Victim 1 and Minor Victim 2 engaged in sex acts with defendant.  (PSR ¶ 27; Plea Agreement at 20.)

After defendant obtained custody over the minors at the Care Home on January 1, 2018 and January 27, 2018, he proceeded to rape his victims repeatedly, and produced multiple files of child pornography as planned.  (PSR ¶¶ 27-28.)

Specifically, on January 1, 2018, defendant arrived shortly after 12:00 a.m., created over a dozen unique child pornography videos, and defendant also created images depicting his sexual assaults of Minor Victim 1 and Minor Victim 2 starting at 12:52 a.m. and his last film was made at approximately 4:11 a.m.  (Plea Agreement at 20.)

On January 27, 2018, defendant arrived shortly after 12:00 a.m. for his 12:00 to 6:00 a.m. shift.  (PSR ¶ 33.)  After he arrived, defendant produced at least four different videos of defendant sexually abusing Minor Victim 1.  Shortly after sexually assaulting Minor Victim 1, defendant abandoned the Care Home at approximately 2:00 a.m., leaving the disabled children at the Care Home without any medical care or supervision for approximately four hours.  (PSR ¶ 33; Plea Agreement at 21-22.)

        5.   Defendant's Admissions at Arrest

Shortly after being confronted with, and admitting, that he tried to engage in sexual acts with an 8-year-old disabled girl, defendant characterized his conduct in a matter of fact manner as "I didn't do nothing to her, I didn't kill her, nothing." "I know you are… if she's hurt or not, she's not hurt, I'm not a killer." (See Exh. D at 21:45-22:00).

Shortly thereafter, defendant lied about his conduct saying he only tried to have sex with Minor Victim 1 once, and "I wouldn't go all the way, because I didn't want to hurt her."  (Exh. D at 24:27-25:00.)

### B. Defendant Produced Child Pornography of Himself Having Sex With a Teenage Girl He Enticed to Engage in Criminal Sexual Conduct With Him

When defendant was about 35 years-old, he enticed Minor Victim 3, then a 15-year-old girl, into engaging in criminal sexual acts with him and in filming some of those sex acts with him.  (PSR ¶ 36; Exh. I.)  Defendant knew she was approximately 15 years old when he engaged in this conduct.  (PSR ¶ 37.)  Defendant admitted that he first reached out to her.  (Exh. D at 30:30-31:05.)  He described their relationship as primarily sexual.  (Exh. D at 31:50-32:04.)

Defendant engaged in and saved screen shots of chats between him and Minor Victim 3 where defendant encouraged her to engage in sexual activity with him.  On November 25, 2018, defendant told Minor Victim 3 that he wanted to have sex with her without a condom and that he would "pull out," meaning not ejaculate inside her.  (PSR ¶ 39; Exhibit J.)  On June 24, 2020, they made plans to engage in sexual conduct that Friday.  (PSR ¶ 40; Exhibit K.)  Defendant also made multiple child pornography videos with Minor Victim 3.  (PSR ¶ 41.)  Some files depicting Minor Victim 3 were saved in defendant's Google folder titled: "13 year old from work."  (Radlinski Decl. ¶ 3).

### C. Defendant's Additional Sexual Misconduct

Defendant also appears to have engaged in a significant amount of additional sexual misconduct further demonstrating that a life sentence is needed to protect the public.

1          1.   <u>Sexual Assault of an Unconscious Adult</u>[9]

2          In defendant's Google Account, law enforcement discovered a

3     video which appears to depict defendant shining a flashlight into an

4     unconscious victim's eyes to confirm the person is non-responsive.

5     Defendant reaches down to move what appears to be a medical gown,

6     exposing the person's buttocks.  (PSR ¶ 44; Exh. L.)  The victim

7     appears to be a patient in a medical facility because the victim was

8     wearing what appears to be a medical gown and laying in a twin bed in

9     a plain and somewhat sterile room where there is another bed a short

10    distance away occupied by a different individual.  (Exh. L.)  In

11    another video (not filed here), what appears to be the same

12    unconscious individual is laying prone on the bed.  Defendant appears

13    to place his face in between the person's buttocks.  A third video

14    depicts a person who appears to be defendant with his mouth in

15    between the buttocks of a person who appears to be wearing the same

16    type of medical gown as the individual depicted in the aforementioned

17    videos.  Defendant is moving his head.  Defendant removes his face

18    from between the buttocks, spreads apart the buttocks, and displays

19    the person's anus which appears to have a substance consistent with

20    saliva around the anus.  (Exh. M.)

21         Defendant has worked at multiple mental health facilities as a

22    mental health worker.  (PSR ¶¶ 182-185.)  Law enforcement has been

---

[9] It is difficult to determine the person's exact age from the
video.  Based on some secondary sex and physical characteristics
somewhat visible in the video, it appears the person is an adult.
Because the government cannot confirm with certainty that this
individual is an adult, however, for the purposes of providing these
videos to the Court, the government is treating the individual as
age-difficult – and therefore the exhibits where this individual is
depicted as possible contraband – and filing those exhibits where
both under seal and <u>in camera</u>.

unable to identify this victim (or perhaps victims) or the location where this abuse occurred, but the investigation continues.

### 2.   Contemporaneous[10] Offers to Abuse Children

Defendant offered "the 8 year old" to co-defendant Bocardo for sexual activity such as a "blowjob." (See Exh. H at 1-2, 6, 9.)  The Court saw much of this evidence for itself during co-defendants' trial.

On May 18, 2021, defendant sent co-defendant Bocardo a file to masturbate to, then said, "You should do that to the 8 year old." (Exh. H at 1.)  Defendant then appeared to send a second video, which prompted defendant to ask co-defendant Bocardo if he would like "a blowjob from her?"  (Exh. H at 2.)  When co-defendant Bocardo appeared to accept that offer, defendant enthused, "Fuckin bomb!!!" "U ready for that??"  (Exh. H at 2.)

On June 29, 2021, defendant again offered to let co-defendant Bocardo join him "in that group home" on Friday.  (Exh. H at 6.)  On June 30, 2021, defendant shared videos of defendant sexually abusing Minor Victim 1, shortly thereafter defendant told co-defendant Bocardo "U can do that to that 8 year old and I'll record it" "It can fit in the 8 year old" "In her ass tho" and asked, "Hot huh[?]" (Exh. H at 9.)

On Friday, July 2, 2021, co-defendant Bocardo asked, "Yo for tonight u down send the 200 on cash app," because "[Re]member last time I record."  (Exh. H at 9-10.)

---

[10] References to defendant's "contemporaneous" conduct refers to conduct contemporaneous to his arrest on August 25, 2021.

1    On July 22, 2021, defendant told co-defendant Banguguilan that

2  he knew a couple that are into kids and that "[t]hey want me to bring

3  a little girl" "so she can eat her out."[11]   (Exh. G at 3, 5.)

4         3.   <u>Contemporaneous Attempts to Regain Access to the Care</u>

5              <u>Home Victims</u>

6    These chats occurred in 2021, when defendant was attempting to

7  regain access to his known victims.  Defendant offered to provide

8  children for sex around the same time when he repeatedly requested

9  shifts at the Care Home to regain access to Minor Victim 1.

10    Defendant initiated a conversation with the administrator of the

11  Care Home on ten separate days (at least once a month) over 2021

12  asking for overnight shifts at the Care Home in Chino where the Care

13  Home Victims lived.  (See Exh. N at 1-7; <u>see</u> <u>also</u> Michelle Clarke

14  Victim Impact Statement, Exh. O at 1.)  On four separate occasions

15  Ms. Clarke offered defendant jobs with "senior clients" or in Upland

16  (also with seniors) at other facilities she administered, because

17  Chino was fully staffed.  (<u>See</u> Exh. N at 3-7.)  Defendant declined

18  each time.  (<u>See</u> Exh. N at 3-7.)   Defendant re-iterated to her that

19  he only wanted shifts at the Chino Care Home.  (See Exh. N at 1-7.)

20    Concurrently, defendant told co-defendant Bocardo that he could

21  engage in sexual acts with Minor Victim 1 and join him at Care Home

22  at various points between May 2021 and July 2021.  (Exh. H at 1-2, 6,

23  9.)  It appears that defendant was bragging to co-defendants that he

24  could provide access to Minor Victim 1 to them for sex, then was

25  actively trying to regain such access.  Defendant's most recent

26

27

28    [11] The phrase "eat her out" in a sexual context typically refers
to orally copulating a female's genitals.

19

attempt to regain access to Minor Victim 1 was on August 7, 2021, less than three weeks before his arrest.  (PSR ¶ 21.)

### 4.  Contemporaneous Attempts to Find Other Night Jobs Watching Other Disabled Children

Defendant's attempts to gain access to children was not limited to trying to regain access to the Care Home in Chino.  A little over a month before his arrest, defendant appeared to be looking for other overnight caregiver jobs with disabled children.  The internet search/web history in defendant's iPhone 7+ indicates that on July 18, 2021, includes: "group home children mental disabilities job," "child care overnight shift hiring Pomona," and "Care Provider for Children With Special Needs," among other similar items.  (Exh. P at 71-73; Radlinski Decl. ¶ 8.)

### 5.  Contemporaneous Searches for Child Sex Dolls

The search history in Defendant's iPhone 7+ also indicated that defendant was looking to purchase sex dolls of children and babies. On August 4, 2021, defendant's web history includes numerous searches for "sex dolls child" and "where to by [sic] silicone sex dolls baby."  (Exh. P at 78-79.)

### 6.  Contemporaneous Attempts to Trick His Minor Live-in Niece to Have Sex with Him

Defendant told co-defendant Banguguilan that he intended to engage in sexual conduct with his co-habitant minor niece.  (Exh. G at 2; PSR ¶ 44.)  On July 24, 2021, defendant then updated co-defendant Banguguilan that he received a naked picture of his niece by tricking her into thinking he was somebody else.  (Exh. G at 7-8.) Defendant also apparently paid her $40 for the photo.  (Exh. G at 8.) Defendant was pleased with his progress.  He told co-defendant

Banguguilan this is "progress u think ima [I'm going to] fuck her just like that?"  (Exh. G at 8.)  Law enforcement also found a video in defendant's possession showing defendant masturbating to what appears to be a clothed picture of his minor niece culminating with him ejaculating on her picture.  (PSR ¶ 44.)

### 7.  Possession of Other Child Pornography

Defendant was also found in possession of child pornography from 106 identified series of child pornography, according to the National Center for Missing and Exploited Children.  (Exh. Q; Radlinski Decl. ¶ 10.)  These identified files only account for some of the 594 files of apparent child pornography in his Google Account.  (PSR ¶ 45.)

### D.  Defendant is Charged and Pleads Guilty

On September 16, 2022, defendant pled guilty to eight counts in the Second Superseding Indictment for his production of child pornography, obtaining custody of children to produce child pornography, and enticement of a minor into engaging in criminal sexual conduct.  (PSR ¶ 1.)

On October 27, 2022, the U.S. Probation Office calculated that defendant's charged conduct results in a guidelines offense level that is 13 levels beyond the maximum offense level contemplated by the United States Sentencing Guidelines Commission.  (PSR ¶¶ 140-148.)  This results in a guidelines sentence of lifetime imprisonment.  (PSR ¶ 148.)  The U.S. Probation Office recommends the guidelines sentence of life imprisonment.  (Dkt. 111 at 2.)

### E.  GUIDELINES CALCULATIONS

In the Plea Agreement, the parties agreed to the guidelines calculation by counts of conviction, and the parties reserved the right to argue for additional specific offense characteristics,

adjustments, and departures.  (Plea Agreement at 23-27.)  The plea
agreement does not address the Multi-Count Adjustment or the Chapter
Four enhancement for a pattern of prohibited sexual conduct.

### 1.   Multi-Count Adjustment

The U.S. Probation Office correctly assessed a four level
Multiple Count Adjustment, not explicitly enumerated in the Plea
Agreement.  (PSR ¶¶ 137-140.)

### 2.   Pattern of Prohibited Sexual Conduct

Furthermore, the U.S. Probation Office assessed an additional
five level enhancement under U.S.S.G. § 4B1.5(b), as defendant is a
repeat and dangerous sex offender against minors.  (PSR ¶ 141-145;
U.S.S.G. § 4B1.5(b).)  The government agrees.

According to U.S.S.G. § 4B1.5(b), where defendant is not a
career offender nor has a prior sex offense conviction, a defendant's
offense level must be increased by five levels if he engaged in
"pattern of activity involved prohibited sexual conduct."

A "pattern of activity" is defined as having engaged in
"prohibited sexual conduct" with a minor on at least two separate
occasions.  (U.S.S.G. § 4B1.5 n.4(B).)  "Prohibited sexual conduct"
includes *inter alia*: production of child pornography, and enticement.
(U.S.S.G. § 4B1.5 n.4(A); PSR ¶ 145.)  Defendant pled guilty to five
counts of producing child pornography; and one count of enticement,
occurring on five different days.  (PSR ¶¶ 2, 5.)  This enhancement
applies.  (See PSR ¶ 145.)

### 3.   Guidelines Sentence of Lifetime Imprisonment

Defendant's resulting total guidelines offense level, after the
three-point reduction for acceptance of responsibility is level 56.
The United States Sentencing Table, contemplates a maximum offense

level of 43, meaning defendant's conduct is 13 levels *more severe* than the maximum contemplated by the guidelines.  U.S.S.G. § 5A. According to the United States Sentencing Commission this circumstance is "extremely rare."  (U.S.S.G. § 5A n.2.)  Where defendant's conduct is more egregious than contemplated by the United States Sentencing Commission, defendant's total offense level is reduced to the maximum offense level 43.  (U.S.S.G. § 5A n.2.)

Defendant is in Criminal History Category I.  (PSR ¶ 155.)  The resulting guidelines sentence is lifetime imprisonment.  The government recommends the guidelines sentence, as does the U.S. Probation Office.  (Dkt. 111 at 2).

**III. REQUESTED SENTENCE**

Based on the egregious facts of this case, the guidelines calculation, and the significant aggravating factors present here, the government recommends a guidelines sentence of lifetime imprisonment.

Specifically, the government and U.S. Probation Office recommend that the Court issue a lifetime sentence of imprisonment on counts five, eight, and twelve to be served concurrently, and a sentence of 30 years imprisonment on each of counts one, four, six, seven, and nine to be served concurrently.

The government also recommends that defendant be sentenced to a lifetime period of supervised release, as well as the imposition of the eight mandatory $100 special assessments totaling $800.

The government also recommends the low-end guidelines fine of $50,000 and the additional $40,000 special assessment ($5,000 per count) pursuant to 18 U.S.C. § 3014(a)(3) (assuming the statute is reauthorized by sentencing), and $50,000 as a producer of child

pornography pursuant to 18 U.S.C. § 2259A.  The government requests a deferred restitution hearing anywhere from 30 to 60 days after sentencing.

The government requests forfeiture of the digital devices which defendant used to commit the crimes charged here.

**A.   The Sentencing Factors at 18 U.S.C. § 3553(a) Support a Guidelines Sentence of Lifetime Imprisonment**

A sentence of lifetime imprisonment for defendant's conduct is sufficient, but not greater than necessary, to achieve the goals of sentencing set out in 18 U.S.C. § 3553(a).

1.   The Nature and Circumstances of the Offense

Defendant engaged in the systematic sexual abuse of disabled children in his custody and care as he worked as their nighttime caregiver.  After defendant was finished with his victims, he abandoned them.  Defendant also enticed and sexually abused a fifteen-year-old victim.

This egregious conduct is worthy of the guidelines sentence of lifetime imprisonment.

a.   Defendant's Guidelines Calculation

The United State Sentencing Guidelines calculation quantified the serious nature and circumstances of defendant's offense.

Here, the nature of defendant's conduct was exceptionally egregious, even by the standards of this already heinous violation. This is reflected in the guidelines calculation for his violation. For example in one count, defendant received enhancements for:

1) Age of the victim, (PSR ¶ 121)

2) custody/care/supervisor control of the victims, (PSR ¶ 122)

3) distributed the child pornography, (PSR ¶ 123)

4) engaged in sexual conduct, (PSR ¶ 124)

5) engaged in sadistic behavior, (PSR ¶ 125)

6) vulnerable victims, (PSR ¶ 126)

7) abused a position of trust, (PSR ¶ 127)

8) engaging in a pattern of sexual abuse.  (PSR ¶ 145.)

All these enhancements highlight how much worse defendant's conduct is compared to any another defendant who produces child pornography for example by taking surreptitious pictures of a minor victim, or who convinces an older minor victim to self-produce child pornography remotely.  Defendant's guidelines enhancements are well-deserved, and accurately reflect the seriousness of the offense.

The facts squarely support the imposition of these enhancements.  For example, these victims were not just a little vulnerable, they were all severely mentally and physically disabled.  Defendant did not just have custody and control, they all relied on defendant as their medical caregiver to keep them safe and alive.  Defendant was not merely placed in a position of trust; he was solely entrusted with their medical and physical wellbeing.

Defendant's high guidelines calculation was not an aberration or an over calculation.  Defendant engaged in conduct that was the result of his pre-meditated plan to film his sexual abuse of disabled children.  He did this by abusing the trust of others and choosing victims who were so vulnerable they could do nothing to stop him.  He also engaged in sadistic sex acts repeatedly.  (Plea Agreement at 24, 26.)  Accordingly, the enhancements for abuse of trust, vulnerable victim, sadistic conduct, and sex act all appear repeatedly, because those were all key parts of the plan.  (Plea Agreement at 24-27.)

Defendant's conduct which gave resulted in the guidelines calculations here were not the result of incidental or isolated circumstances.  Therefore, the Court should give heavy weight to the guidelines calculations when considering the nature of this offense.[12]

2.   Need to Afford Adequate Deterrence and Protect the Public from Further Crimes of Defendant

a.   Defendant's Conduct During the Offenses

Defendant's conduct during the offenses demonstrate that he cannot be deterred from any future crimes.  In December and January 2018, defendant explicitly sought his job back so he could abuse the Care Home Victims and create videos of it. (PSR ¶¶ 27-28.)  Then when he was finished, he abandoned them to their fate.  (PSR ¶ 33.) Defendant's lack of empathy shows that defendant cannot be deterred from future crimes.

Leaving children with the mental capacities of a toddlers is not just emotionally cruel, it can have potentially serious physical consequences.  Children often hurt themselves without adult supervision.  This is doubly true for severely disabled children with the mental capacity of toddlers, some of whom have periodic seizures, brain injuries, and cerebral palsy.  Had there been a medical emergency during the hours defendant abandoned them, there could have been fatal consequences.  Defendant knew all of this.  Yet he and abandoned them anyway.  Simply because he did not care.

Further demonstrating his absence of empathy, defendant created GIF of his sexual abuse of Minor Victim 1, such as showing her being forced to orally copulate his penis to a song and a waiving American

---

[12] The government has attached additional victim impact statements for the Court to consider at Exhibit R.

26

flag, with a degrading caption.  (PSR ¶ 29.a. fn. 1.)  In another GIF
defendant included an image of Minor Victim 1's vagina and colostomy
bag with a caption threatening to kill anybody who tried to take away
"my PUSSY!!!" and ". . . this belongs to me and only me! And I will
KILL for this PUSSY!!!"  (PSR ¶ 29(a), fn 1; supra II.A.c.)

Defendant's statements degrading Minor Victim 1 to nothing more
than "my PUSSY!!!" demonstrates that he thought of her as a prized
sex toy, nothing more.  (PSR ¶ 29(a), fn.1.)

Defendant bragged about how he abused Minor Victim 1 while
sharing files depicting him doing so, such as statements like "in her
ass" and "8 year old who gave me head." (Exh. H at 8, 10.)  Defendant
was proud of his "accomplishments" and wanted to gain status by
sharing her with others.  Defendant invited co-defendant Bocardo to
abuse Minor Victim 1 at the Care Home and even offered to record
Bocardo raping "the 8 year old." (See Exh. H at 1-2, 6, 9.)  There
was even discussion of payment on the Friday they previously proposed
going to the Care Home together.  (See Exh. H at pp. 6, 10.)

Defendant treated disabled children he had known for years as
nothing more than sex toys to be shared.  Defendant cannot be
deterred from future criminal conduct.  Even worse, at times
defendant talked to his victims and filmed the faces of his victims
while he was raping them.  Even worse than treating them like
inanimate objects, defendant appeared to take pleasure in their
reactions to his torture.

        *b.   Defendant's Other Contemporaneous Conduct*

Defendant's contemporaneous conduct and lack of remorse further
demonstrates that defendant cannot be deterred from future conduct.

In his recorded interview with law enforcement in August 2021, defendant minimized his conduct claiming that he tried to have sex with her, but flatly stated "I didn't do nothing to her, I didn't kill her, nothing." "I know you are… if she's hurt or not, she's not hurt, I'm not a killer." (See Exh. D at 21:45-22:00). Minor Victim 1's horrific abuse was far more than "nothing."

Then defendant tried to further minimize his conduct further by saying that he only tried to have sex with her one time, and that he "I wouldn't go all the way, because I didn't want to hurt her." (Exh. D at 24:27-25:00.) In reality, defendant had engaged in brutal sexual acts over a two year period. He had gone "all the way" numerous times, all of which clearly caused Minor Victim 1 pain. Defendant refuses to acknowledge the gravity of his own conduct. The only way to keep the public safe from defendant is to keep defendant in custody.

Moreover, defendant's contemporaneous conduct demonstrates that the passage of time has only made defendant more dangerous. Three years after the abuse at the Care Home, defendant began badgering Michelle Clarke for overnight shifts at least once a month in 2021 until his arrest. (Exh. N.) Defendant did this to regain access to the Care Home Victims so he could provide those victims to his friends and make more child pornography. (PSR ¶¶ 27-28.) Defendant was trying to make his Telegram boasts (occurring during that same period), a reality. (See Exh. G, H.) Defendant further demonstrated that his intent was access to his victims by rejecting four different offers of employment that was not specifically at the facility where the Care Home Victims lived. Defendant clarified that he would only work in Chino. (Exh. N 3-7.)

Defendant's other 2021 contemporaneous conduct also demonstrates that the passage of time had just made him seek out new avenues of abuse.  Defendant was actively seeking to trick his minor niece into sex.  (supra II.C.6; PSR ¶ 44.)  Defendant was also seeking other overnight employment with disabled children during the same period.  (supra II.C.4; Exh. P at 71-73).  Furthermore, defendant also apparently sexually assaulted an unconscious adult in a medical facility like setting.  (PSR ¶ 44; Exh. L; Exh. M.)

Defendant's goal throughout 2021 was to recreate what had worked so well three years earlier, namely, gaining overnight access to disabled children (or unconscious adults) who he could use as sex toys for his child pornography films.  The only way for the public to be safe from defendant is for defendant to receive the guidelines sentence of lifetime imprisonment.

### 3.   Need to Reflect the Seriousness of the Offense and Provide Just Punishment

Defendant's conduct is some of the most heinous conduct against the most vulnerable victims in society, as reflected in his initial offense level 56.  Simply put, the most serious punishment available is the only just punishment appropriate for such a repeated, heinous and pre-meditated crime committed against these victims.  Lifetime imprisonment is the only punishment that reflects the seriousness of the offense and is a just punishment for defendant's conduct.

### 4.   Avoiding Unwarranted Sentencing Disparities

The imposition of a Guidelines sentence – here, a life sentence – also avoids unwarranted sentencing disparities among similarly situated defendants.  18 U.S.C. § 3553(a)(6).  The best way to ensure consistent sentences across courtrooms, districts, and the country is

strongly consider the Sentencing Guidelines when weighing the 18
U.S.C. § 3553(a) factors.  See United States v. Saeteurn, 504 F.3d
1175, 1181 (9th Cir. 2007) ("Congress's primary goal in enacting
§ 3553(a)(6) was to promote national uniformity in sentencing[.]")
(citations/quotations omitted).

Defendant's guidelines calculation for this horrendous conduct
is 13 levels *beyond* the maximum offense level resulting in a
guidelines sentence of life.  That is before even considering all the
aggravating factors listed above.  Defendant should receive that
guidelines sentence.

### 5.   History and Characteristics of the Defendant

Defendant grew up in a normal family, with a normal upbringing.
(PSR ¶¶ 160-168.)  Defendant was able to obtain a certification as a
Nursing Assistant.  (PSR ¶¶ 169-170.)  Defendant displayed no history
of mental or physical health issues, nor of any substance abuse.
(PSR ¶¶ 174-178.)  In short, there is nothing about defendant's
history or characteristics that warrant a downward variance.

Moreover, defendant's sexual attraction to children is not an
unusual characteristic for a defendant who filmed his sexual abuse
children.  Undoubtedly, almost every defendant sentenced for
producing child pornography and enticing a minor into sexual activity
had a sexual attraction to children.  The United States Sentencing
Commission likely took this fact into account when crafting the
guidelines.

Therefore the mere fact that defendant has a sexual attraction
to children is not a "mitigating circumstance of a kind or to a
degree, that has not been taken into consideration by the Sentencing
Commission" or a fact that should result in a different sentence

30

here.  See 18 U.S.C. § 3553(b).  Defendant should not receive a downward variance.

### B.   Supervised Release

Given defendant's long-term and extensive abuse of the victims, and to protect the public from further crimes, the government agrees with the Probation Officer that a lifetime term of supervised release is appropriate.  (Dkt. No. 111, at 3.)  Defendant agreed not to contest the imposition of lifetime supervised release in his plea agreement.  (Plea Agreement at 3.)

### C.   Restitution

To date, all of the restitution claims expected have not been received.  The government asks for a deferred restitution hearing, 30 to 60 days after sentencing.

### D.   Fine

Defendant appears to have an ability to pay his financial obligations stemming from his criminal conduct.  Defendant is a registered owner of a property in Pomona, California.  According to the PSR, the residence was valued at approximately $630,000 and was purchased in 2012 for $262,000 meaning there was at least approximately $368,000 equity in the home when the U.S. Probation Office last checked.  (PSR ¶ 188.)

Thus defendant is not indigent and is able to pay a low-end guideline fine of $50,000, an additional $5,000 per count ($40,000) pursuant to 18 U.S.C. § 3014(a)(3) assuming the statute is still active, and an additional $50,000 special assessment as a producer of child pornography pursuant to the Amy, Vicky, Andy Child Pornography Victim Assistance Act of 2018 (18 U.S.C. § 2259A).  (See PSR ¶¶ 205-207.)  Thus, in additional to whatever restitution the Court orders,

1  the Court should in total fine defendant an additional $140,000 which
2  is easily covered by the equity in his home.

3    The government disagrees with the U.S. Probation Office that
4  defendant is unable to pay and is not likely to become able to pay a
5  $50,000 fine.  Just the equity in his house alone can cover the
6  $50,000 in addition to his other special assessments and other fines,
7  and any restitution claims to date.  (See PSR ¶¶ 50, 188.)

8    **E. Forfeiture**

9    The government also requests that the Court forfeit defendant's
10  digital devices that contained child pornography, as
11  instrumentalities of defendant's offenses.  These devices were an
12  iPhone 7+, Samsung Galaxy S5, Samsung SD card, and an LG G6 cellular
13  phone which were seized during the execution of the search warrants
14  on defendant, his residence, and his car on August 25, 2021.
15  Defendant admitted that the Samsung Galaxy S5 was used to produce
16  some of the child pornography and some of that child pornography was
17  transferred to the LG G6.  (PSR ¶ 23.)  The iPhone 7+, Samsung SD
18  card contained child pornography as well.  (Radlinski Decl. ¶ 11.)
19  The Court may forfeit these devices as "any property . . . used or
20  intended to be used to commit or to promote the commission of such
21  offense . . ." in a child pornography crime.  See 18 U.S.C. § 2253
22  (a)(3).  The government properly noticed this forfeiture in the
23  Second Superseding Indictment, and defendant's conduct and property
24  satisfy this statute.  These devices should be forfeited.

25  **IV.  CONCLUSION**

26    The government respectfully recommends a life sentence, followed
27  by lifetime supervised release, imposition of the eight mandatory
28  $100 special assessments totaling $800, a $50,000 fine, a $40,000

special assessment pursuant to 18 U.S.C. § 3014(a)(3), assuming the statue is reauthorized, and an additional $50,000 special assessment pursuant to 18 U.S.C. § 2259A.